# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45675

EAGLE CREEK IRRIGATION COMPANY, INC., an Idaho corporation,

    Plaintiff-Counterdefendant-Appellant,

v.

A.C. & C.E. INVESTMENTS, INC., a California corporation,

    Defendant-Respondent,

and

LEE P. ENRIGHT and NANCY K. ENRIGHT, Husband and Wife,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2019 Term

Opinion Filed: August 27, 2019

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Blaine County. Jonathan P. Brody, District Judge.

District Court Judgment, vacated in part.

Lawson, Laski Clark & Pogue, PLLC, Ketchum, for appellant. Edward A. Lawson argued.

McHugh Bromley, PLLC, and Cosho Humphrey, LLP, Boise, for respondent. Christopher M. Bromley argued.

---

BURDICK, Chief Justice.

Eagle Creek Irrigation Company ("Eagle Creek") appeals the Blaine County District Court's award of summary judgment in favor of A.C. & C.E. Investments, Inc. ("AC&CE Investments"). The dispute centers on 15 shares of Eagle Creek stock which authorize the holder to divert 30 cfs of water (or 15 miner's inches) of Eagle Creek's water right. AC&CE

1

Investments purchased 15 acres ("the Property") located within Eagle Creek's boundaries. The prior property owners also owned 15 shares in Eagle Creek stock. The question presented on appeal is whether the 15 shares passed as an appurtenance to the Property. The district court ruled that AC&CE Investments acquired 15 shares in Eagle Creek when it acquired title to the Property because the shares passed as an appurtenance to the Property. Eagle Creek timely appeals.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2011, the Snake River Basin Adjudication ("SRBA") court declared Eagle Creek the owner of Water Right No. 37-00863E (the "SRBA Water Right"). The SRBA Water Right granted Eagle Creek the right to divert 4.56 cfs (228 miner's inches) of water and carried a priority date of 1902. Eagle Creek also received a water right for .04 cfs for aesthetic and recreation purposes under a separate water right (Water Right No. 37-00863F) for a total of 4.6 cfs (230 inches). The SRBA Water Right declares Eagle Creek's permissible place of use as 143.9 acres within its water-delivery system. Eagle Creek has a serviceable area of 189 acres. This area is informally referred to as "the Eagle Creek subdivision." The subdivision sits in a valley north of Ketchum, Idaho along Highway 75. The Property is the most northeastern lot in the subdivision.

The SRBA Water Right dates to a 1923 Blaine County District Court decision (the "Original Water Right"). The Original Water Right authorized the diversion of 4.6 cfs of water (230 miner's inches) and applied to roughly the same area as the Eagle Creek subdivision. Since the Original Water Right was first decreed, the property in the area has been divided and has changed hands numerous times.

Before Eagle Creek formed in 1973, John and Gladys Feldhusen owned the Original Water Right, the Property, and other property in the area. The Property was subdivided into three five-acre lots, referred to by separate deeds as Lot 17, Lot 18, and Lot 19. In 1970, the Feldhusens conveyed those lots by separate deeds, "with their appurtenances," to William and Patricia Woolway.

In 1973, Eagle Creek was formed as a nonprofit mutual irrigation corporation to hold water rights, in trust, for the benefit of its shareholders. As the corpus of its trust, Eagle Creek purchased 90% of the Original Water Right from the Feldhusens. This amounted to 207 miner's inches of water (4.14 of 4.6 cfs, or 207 of 230 miner's inches). Eagle Creek's articles of

2

incorporation ("Articles") declared its purpose as constructing, maintaining, and operating a system of water delivery for its shareholders. For admitting shareholders, Eagle Creek stated in both the Articles and Bylaws:

> [T]his corporation shall admit as stockholders only such persons, groups of persons, organizations or corporations who own property in the immediate vicinity of the irrigation system and to which property the corporation can make delivery of water for domestic or irrigation purposes under the contemplated distribution system of the corporation.

Those who met these conditions were "entitled to subscribe to and purchase shares of stock . . . as provided in the corporation's By-Laws." Under the Articles and Bylaws, Eagle Creek would issue either 207 or 230 shares on a one-share-per-irrigable-acre basis.[1] For water rights, the Articles stated:

> The corporation will hold all water rights acquired in Trust, and operate the system for the distribution of water primarily for the benefit of the lands to which said water rights are to be appurtenant. The shareholders of the corporation shall be entitled to the appropriate share of the water annually available by virtue of their proportionate stock interest in this corporation.

Eagle Creek shares could not be transferred without Board approval, which was granted "under such criteria as the By-laws may prescribe." A share could be transferred only by its holder or its holder's legal representative "by the surrender and delivery of the said certificate and assignment of said certificate and the shares of stock represented thereby in writing." Old stock certificates were to be "surrendered and cancelled before new certificates in lieu thereof shall be issued."

In 1974, Eagle Creek sent "form letters to all prospective and interested buyers." Included among those "interested buyers" were the Woolways. It appears the Woolways acquired some quantity of shares because, in October 1974, the Woolways conveyed the Property to Glenn and Carolyn Olbum by three separate deeds. Two deeds specifically conveyed the properties "together with 5 shares in the Eagle Creek Irrigation Company," but the third was silent on whether Eagle Creek shares were included.

In 1981, the Olbums conveyed the lots by warranty deed "together with their appurtenances," but the deed made no mention of Eagle Creek shares. A similar conveyance occurred seven years later when the lots were conveyed to Harold and Flora Jonassen "together with their appurtenances," with no mention of Eagle Creek shares.

---

[1] Article VI(3) of the Articles states that there are 230 inches of water for distribution, whereas Article II of the Bylaws has the number 230 crossed out and "207" handwritten above the crossed-out 230 (e.g. "~~230~~ 207").

Around 1990, with the SRBA looming, the Jonassens hired lawyers to investigate their water rights. The investigation resulted in the Jonassens filing two claims for water rights in the SRBA. Around this time, Lee and Nancy Enright became interested in purchasing the Property. In a letter, the Jonassens's lawyer told the Enrights that a portion of the Original Water Right was "apparently thereafter transferred" to Eagle Creek. The letter further explained that because Eagle Creek had not yet filed a claim in the SRBA, the lawyer had filed claims for the Jonassens. Eagle Creek would eventually file a claim with the SRBA. Later in the same year, the Jonassens conveyed the lots to the Enrights "together with their appurtenances." A year later, the Enrights filed for a change of ownership in the SRBA claim. The filing was accepted.

In 1991, the Eagle Creek board of directors added a provision to the Bylaws declaring that if a shareholder wished to sell the real property to which Eagle Creek was delivering water, the shareholder must apply for a transfer of shares within sixty days of selling the property. Failure to comply would result in Eagle Creek deeming the stock cancelled and converted to treasury stock. However, if the shareholder sold the property and "provide[d] for an assignment of the stock in a contract or sale agreement with the new purchaser," then Eagle Creek would "consider such reference as an application to transfer the shares of stock previously held by the selling stockholder."

In 1992, the Enrights entered into an agreement with Eagle Creek to change their point of diversion further upstream subject to Idaho Department of Water Resources approval. At the time, the Enrights owned 15 shares of Eagle Creek stock. Their stock certificates made no specific mention of where the water was to be used, but stated that "each share entitles the owner to receive .02 of a cubic foot of water per second of time per acre or one Miner's inch when available from the waters of Eagle Creek."

In a memorandum decision approving the Enright's application, the Department wrote that the Enrights sought to change the diversion point for .30 cfs of water (15 miner's inches) "represented by fifteen (15) shares of stock" in Eagle Creek. The Department made the following conclusions regarding ownership of the water right:

> 6. The water sought in the transfer is represented by shares of stock in ECIC and is a portion of the company's water right.
>
> . . .

4

8. The only right to divert and use the waters of [the Eagle Creek stream] is vested with and is controlled by [Eagle Creek] which distributes water to its shareholders.

. . .

16. The proposed change has been approved by [Eagle Creek], the holder of the water right and is in the local public interest.

The Department also commented on questions over the scope of Eagle Creek's water right:

There appears to be conflicting information concerning the total number of shares of capital stock of [Eagle Creek], i.e. 207 shares v. 230 shares. The difference, however, is not of particular significance to the holding in this decision but probably should be cleared up by [Eagle Creek] for its own purposes.

In 2005, Eagle Creek provided the Enrights with a quitclaim deed so they could "convey any ownership interest [they] may have in the Eagle Creek water right back to the company." Eagle Creek wrote that this was "necessary" because the Department "transferred ownership of a portion of the original water right from the company to [the Enrights] on its records when it approved your water right transfer." Eagle Creek reassured the Enrights, explaining: "You will, of course, continue to rely on your 15 shares of stock in the Company to receive water out of Eagle Creek to irrigate your property." The Enrights obliged and quitclaimed to Eagle Creek "all their right, title and interest in and to Water Right No. 37-863B."

In 2006, Lee and Nancy Enright executed a deed of trust with the Bank of America. The deed of trust gave the bank a security in the Property "together with . . . all easements, appurtenances, and fixtures now or hereafter a part of the property." A separate deed of trust gave the Bank's trustee the property "together with all . . . appurtenances now or later in any way appertaining to the Property."

In 2009, in preparation for the foreclosure sale, emails were exchanged between the title company, the auction company, the Enrights, and Eagle Creek's attorney. In an email to the title company, the auction company inquired about the status of water rights on the Property:

There are surface water rights that are to be conveyed with the property. Do these have to be transferred with a separate deed? If so, what type of deed? Or will it be included in the warranty deed transferring the real estate?

In response, the title company stated that it had spoken with the Department; "[t]he individual water rights for Eagle Creek Subdivision have been disallowed and now are decreed in the name of Eagle Creek Irrigation Company" and "[e]ach owner in the subdivision have [sic] shares in the irrigation company." The auction company then asked the Enrights for information on their

shares so they could better advertise them. The Enrights responded: "We have one inch water rights per acre for total of 15 inches (15 shares). The water rights go with the land. (One inch per acre). I have the certificates which document that." The auction company forwarded the Enrights' response to the title company. It told the title company that it would set up the purchase contract to convey the water rights with the deed and then the purchaser could change the Department's records. The title company reached out to Eagle Creek's attorney for confirmation of the Enrights' description of their water rights because the description "didn't jive" with what it had been told. Eagle Creek's attorney replied: "Enright's summary is accurate and I'm certain he can produce the stock certificates which state what amount of water each share entitles the holder to use." Eagle Creek's attorney also indicated that Eagle Creek was the owner of the water right.

In 2010, the SRBA Court disallowed the Enrights' SRBA claim (Claim No. 37-00863B) with prejudice and, in July 2011, declared Eagle Creek the owner of the SRBA Water Right. A little more than a month later, on September 8, 2011, the bank foreclosed on the deed of trust and the trustee conveyed the Property to AC&CE Investments. Thereafter, AC&CE Investments took possession of the property and began diverting water.

After the conveyance, Eagle Creek and AC&CE Investments discussed the shares. Before it would reissue the shares in AC&CE Investments' name, Eagle Creek asked AC&CE Investments to: agree to abide by the Enrights' 1993 diversion agreement; pay past-due assessments on the shares ($50 per share); and line or pipe the ditch crossing the Property. AC&CE Investments' reply stated that it acquired the water rights as an appurtenance by purchasing the land. AC&CE Investment's position was that it might not be responsible for the assessments, the Department had authorized the diversion, and Eagle Creek was responsible for lining the ditches.

Eagle Creek then filed a complaint seeking declaratory and injunctive relief and a decree stating it owned all water rights and the 15 shares of Eagle Creek stock. It later amended its complaint to include damages. AC&CE Investments asserted many affirmative defenses, but also counterclaimed to quiet title to the 15 shares and the water rights. After discovery, the parties filed cross-motions for summary judgment on several issues, including who owned the 15 shares of Eagle Creek stock. After a hearing, the district court granted partial summary judgment in favor of AC&CE Investments and denied Eagle Creek's motion. The district court acknowledged

6

that not all issues were ripe for summary judgement because factual issues remained. However, the district court determined that appurtenancy of the water right was a matter of law that could be resolved on summary judgment. The district court ruled that "when AC&CE acquired title to its fifteen acres, ownership of fifteen shares of stock in Eagle Creek passed with it as an appurtenance." The district court reasoned that because the water right is appurtenant to the land, and because the shares merely represent the water right, AC&CE Investments received the water right when it acquired the Property.

The case proceeded to trial. After stipulating to the admission of several exhibits and presenting opening statements, the parties reached a settlement. As part of the settlement agreement, Eagle Creek agreed to issue 15 shares of stock to AC&CE Investments backdated to the date of the trustee's sale. In return, AC&CE Investments agreed to line the ditch in certain areas within three years or upon sale of the Property. The agreement provided that the court's memorandum decision on summary judgment "shall be entered as a final, appealable judgment" but that "all matters not decided" in that decision "shall be dismissed, with prejudice . . . ." The court entered the following judgment:

> When A.C. & C.E., Investments, Inc. acquired title to its fifteen acres, ownership of fifteen shares of stock in Eagle Creek passed with it as an appurtenance. Because the water right is appurtenant to the land, A.C. & C.E. received the right to water when it acquired the fifteen acres. The decision does not affect Water Rights 37-863E and 37-863F.
>
> . . .
>
> The settlement agreement . . . is binding upon the parties henceforth.

Eagle Creek timely appeals.

## II.    ISSUES ON APPEAL

1. Whether shares in a mutual irrigation company pass as an appurtenance to a property when neither the water right nor the corporate documents indicate that the shares are appurtenant to the specific property conveyed.

2. Whether AC&CE Investments is entitled to an award of costs and attorney's fees on appeal.

## III.    STANDARD OF REVIEW

This Court reviews a motion for summary judgment

> pursuant to the same standards as the district court. The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. All reasonable inferences that can be drawn from the record are to be drawn in favor of the

7

nonmoving party, and disputed facts are liberally construed in the nonmoving party's favor.

*Monitor Fin., L.C. v. Wildlife Ridge Estates*, LLC, 164 Idaho 555, 559, 433 P.3d 183, 187 (2019) (citations and internal quotation marks omitted).

Whether water rights pass as an appurtenance is a matter of law. *Ireton v. Idaho Irr. Co.*, 30 Idaho 310, 164 P. 687 (1917). Questions of law are reviewed de novo. *Monitor Fin*, 164 Idaho at 559, 433 P.3d at 187.

## IV. ANALYSIS

Before reaching the analysis, we must demarcate the issue on appeal from the issues dismissed with prejudice by the district court per the parties' settlement agreement. The sole issue on appeal is whether the district court erred in determining that the 15 shares of Eagle Creek stock automatically passed to AC&CE Investments as an appurtenance to the Property. Every other issue advanced below was dismissed with prejudice as part of the parties' settlement agreement because those issues involved questions that were not reached on the summary judgment.

Even if those issues were not dismissed, the settlement agreement leaves them moot. AC&CE Investments currently possesses the 15 shares. Thus, we need not decide whether AC&CE Investments, as a landowner within Eagle Creek's boundaries, is entitled to receive the shares under Eagle Creek's Bylaws. We need not decide whether the 15 shares reverted back to treasury stock or whether the Enrights's emails were sufficient to transfer the shares under the 1991 Amendment. Also mooted are any lingering questions about Eagle Creek's transfer restrictions, corporate actions, or corporate existence. The parties have resolved the dispute giving rise to those arguments.

For the issue on appeal, it is helpful to differentiate between the appurtenancy of a water right and the appurtenancy of a share in a mutual irrigation company. Though not clear in our prior case law, these are two separate inquiries. As will be explained in further detail, mutual irrigation companies, like Eagle Creek, own water rights with a "general" appurtenancy—that is, the water right is appurtenant to all of their serviceable land. Determining whether a particular share is appurtenant to a specific tract of land depends upon the factual inquiry into the mutual irrigation company's governing documents and the history of the water right. While a share in a mutual irrigation company can be appurtenant to a specific tract of land within an irrigation company's serviceable area, such specific appurtenancy is not an integral feature.

8

Here, the district court ruled that appurtenancy of a share in a mutual irrigation company is a question of law. Because the district court set aside the factual issues of corporate governance before reaching this issue, we vacate the portion of the district court's judgment which states that the underlying water right and the 15 shares were appurtenant to the Property.

**A. Historical and legal background on water-delivery organizations and the Carey Act.**

    a.  <u>There are three main types of water-delivery organizations in Idaho: the mutual irrigation company, the commercial ditch corporation, and the irrigation district.</u>

How this Court treats ownership and appurtenancy in water-delivery organizations depends on the type of entity involved.

The mutual irrigation company is formed expressly for the purpose of furnishing water to shareholders, not for profit or hire. *Jacobucci v. Dist. Court In & For Jefferson Cnty.*, 189 Colo. 380, 386, 541 P.2d 667, 671 (1975). Thus, the defining feature of the mutual irrigation corporation is that it operates to supply and transport water, at cost, for the lands of its members. *See* WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES Vol. I, at 479 (1971). The mutual irrigation company should be distinguished from ordinary "public service" entities, because "being in private service only," it is "not subject to the public control which obtains as to public service companies." SAMUEL C. WIEL, WATER RIGHTS IN WESTERN STATES Vol. II, at 1266 (3rd ed. 1911). As such, a mutual irrigation company cannot be "forced to deliver water to others than its stockholders." *Id.* They are largely autonomous, subject to their own bylaws, articles of incorporation, the law generally applicable to corporations, and a few specific statutes and Constitutional provisions. *Gasser v. Garden Water Co.*, 81 Idaho 421, 425, 346 P.2d 592, 593 (1959).

In contrast to the mutual irrigation company, a commercial ditch company holds water rights for profit. Jeffrey C. Fereday, *Ownership of Water Rights in Irrigation Water Delivery Organizations: An Outline of the Major Issues*, *in* WATER ORGANIZATIONS IN A CHANGING WEST (Natural Res. Law Ctr., Univ. of Colo. Sch. of Law 1993). The shareholders of a commercial ditch company are those who built it, not those who make use of the water. *Id.* This was the main type of irrigation company in operation when the framers of Idaho's Constitution imposed Constitutional restrictions on ditch companies. *See* Fereday, Jeffrey C., et al., WATER LAW

HANDBOOK 345–46 (2019). The commercial ditch company's heyday was in the 1880's; almost none persist today. *Id.*

> Commercial ditch companies were generally organized in one of three ways:
>
> (1) The first form is a "construction or development company," a carrier ditch company that would construct the canals and other facilities, convey lands to farmers, and enter into water delivery contracts with these settlers. Once all lands had been irrigated and the canal's capacity fully subscribed, the carrier ditch company would convey the water rights and facilities to the farmers or, more likely, to a mutual irrigation company that the construction company would set up with the settlers as its shareholders. At this point, the carrier ditch construction company would go out of business, presumably at a profit for its backers. This is precisely the formula used in implementing the Carey Act.
>
> (2) The "private contract company" is one set up for perpetual service to farmers with whom it would contract; they would pay for the water delivery at established rates, whether they used the water or not. The users never acquire any interest in the water rights or facilities. Historically [before state Constitutional provisions provided otherwise], such a company was not subject to state control of rates.
>
> (3) A true "public utility company," is one which holds itself out to serve all comers, so long as there is adequate water supply, on an annual fee for service based primarily on the amount of water used. The deliberate entry into public service caused a dedication to public use and subjected these companies to public utility regulation (at least after public utility commissions came into being).

Fereday, *Ownership of Water Rights in Irrigation Water Delivery Organizations: An Outline of the Major Issues* at 4 (citing Wells A. Hutchins, *Commercial Irrigation Companies* USDA Tech. Bull. 177 at 5–6 (1930)).

Lastly, irrigation districts are formed pursuant to statute. I.C. §§ 43-101–2554; *Yaden v. Gem Irr. Dist.*, 37 Idaho 300, 216 P. 250, 252 (1923) ("Irrigation districts are creatures of the statutes."). Thus, irrigation districts "are quasi public or municipal corporations, and as such have only such power as is given to them by statute, or such as is necessarily implied." *Id.* Landowners served by irritation districts do not hold individual water rights in connection with their service.

b.   The Carey Act.

In 1894, Congress passed the Carey Act, a homestead law that guaranteed up to a million acres of the public domain to Western states if the states would carry out a water development and settlement plan. MIKEL H. WILLIAMS, IDAHO DEP'T OF RECLAMATION, THE HISTORY AND DEVELOPMENT AND CURRENT STATUS OF THE CAREY ACT IN IDAHO 1 (1970). The Carey Act was

enacted to encourage westward expansion into desert lands when the 1890's land rush stalled because most areas with readily available water had been settled. *Id.*

To implement the Act, the federal government agreed to convey lands to the states once an ample supply of water was furnished to areas. *Id.* at 2–3. To provide the supply of water, for-profit "construction companies" would seek the state's approval to build irrigation projects. *Id.* at 6. The state would then determine whether there was enough unappropriated water for the venture. *Id.* If satisfied by the proposal, the State would determine the water rights that the construction company could sell. *Id.* The construction company would then sell stock in a non-profit "operating company" (formed according to state statutory procedure) to settlers who would perfect the water right by putting the water to beneficial use on the land. *Id.* (citing *In re Robinson*, 61 Idaho 462, 103 P.2d 693 (1940)). In form, operating companies acted much like mutual irrigation companies because they operated to deliver water to their shareholders at cost. *Id.* Once the irrigation system was completed and the construction company had sold all (or most) of the stock in the operating company, the construction company would convey all its interest in the irrigation system and water rights to the operating company. *Id.* The federal government would then issue land patents directly to the settlers. *Id.*

As a result, the "origin and purpose of Carey Act companies are distinct from those of ordinary water corporations [and] have been generally recognized by the statutes and by the court as forming a distinct class of water corporations." *In re. Johnston*, 69 Idaho 139, 145, 204 P.2d 434, 438 (1949). Under Idaho law, "water rights to all lands acquired under the [the Carey Act implementation chapter] shall attach to and become appurtenant to the land as soon as title passes from the United States to the state." I.C. § 42-2025. Thus,

> [i]t seems clear that by virtue of the statutory conditions and these contracts, and the certificate issued pursuant to them, that the company sells, and the purchaser buys a water right dedicated to his land . . . It seems clear that the certificate in carrying out the whole plan represents and must represent a water right sold to the settler and dedicated to his land, and of which he is the beneficial owner. And further, at least in the absence of any showing of separation, the water right is an appurtenance to the land to which it was dedicated and is part of that property.

*Leland v. Twin Falls Canal Co.*, 51 Idaho 204, 3 P.2d 1105, 1107 (1931). Thus, a Carey Act operating company's shares document the settler's ownership of the water right. *See* WILLIAMS, *supra*, at 7 ("It must be remembered that corporations organized to construct irrigation systems under the Carey Act do not become owners of water rights or irrigation systems; but are only

11

given the right to sell water rights for the purpose of recovering the cost of the construction of the works with a reasonable profit.") (citing I.C. 42-2504 (1917)).

### B. Whether shares in a mutual irrigation company are appurtenant to specific tracts of land is determined by the contract between the shareholder and the corporation.

In Idaho, water rights are real property. I.C. § 55-101 ("Real property or real estate consists of . . . ditch and water rights . . . ."). Water rights can either be conveyed with the land on which they are put to beneficial use, or separate from it. *Fed. Land Bank of Spokane v. Union Cent. Life Ins. Co.*, 54 Idaho 161, 29 P.2d 1009, 1011 (1934) ("A water right is real property and may be sold and transferred separately from the land upon which it has been used, the same as any other real property") (quoting *In re Rice*, 50 Idaho 660, 667, 299 P. 664, 666 (1931)). In either case, the purchaser receives no greater right than the seller could convey at the time of sale. *Beecher v. Cassia Creek Irr. Co.*, 66 Idaho 1, 7, 154 P.2d 507, 509 (1944) ("One who purchases a water right acquires no better or greater right than his vendor."). When interpreting a conveyance of property, "[u]nless [appurtenant water rights] are expressly reserved in the deed or it is clearly shown that the parties intended that the grantor would reserve them, appurtenant water rights pass with the land even though they are not mentioned in the deed and the deed does not mention 'appurtenances.'" *Joyce Livestock Co. v. United States*, 144 Idaho 1, 14, 156 P.3d 502, 515 (2007) (citing *Silverstein v. Carlson*, 118 Idaho 456, 797 P.2d 856 (1990)).

If a share in a mutual irrigation company represents a discrete water right appurtenant to a specific tract of land, it follows that the share would pass as an appurtenance to that specific tract of land under *Joyce Livestock*. However, shares representing the right to delivery of water from a mutual irrigation company's water right present an altogether different problem. While typical water rights are decreed as appurtenant to specific tracts of land, a water-delivery organization's water right is decreed with a "generally described place of use." I. C. § 42-219(7). This results in a sort of legal fiction—the "general" appurtenancy. As we acknowledged in *A & B Irrigation District v. Idaho Department of Water Resources*, the legal effect of a water right which was "limited to the irrigation of 62,604.3 acres within the A & B Irrigation District boundary" was that the "water diverted from any one of the points of diversion is *appurtenant to* and therefore can be used *on any and all of the 62,604.3 acres within the defined place of use.*" 153 Idaho 500, 514, 284 P.3d 225, 239 (2012) (emphasis added). For similar reasons, water-delivery entities are permitted to move water around their permissible place of use without

12

complying with the transfer requirements of Idaho Code section 42-222(1). No amount of water is tied to a specific tract of land without a more precise assignment. *See, e.g.*, I.C. § 42-2025 (1895) (assignment for Carey Act companies); I.C. § 43-1707 (assignment for irrigation districts obtaining water under the Carey Act).

Because no appurtenancy statutes apply specifically to mutual irrigation companies, whether a share is appurtenant to specific tract of land is a matter of contract and corporate governance. *See* WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES, Vol. I, at 479 (1971). ("Appurtenance of a water right, which is a legal matter . . . is to be distinguished from appurtenance of mutual-company stock to land, which is a contractual matter between the company and its shareholders."); SAMUEL C. WIEL, WATER RIGHTS IN WESTERN STATES, Vol. II, at 1173 (3rd ed. 1911) ("Whether the water right is appurtenant to the stockholder's land is a question of fact in each case, as is also whether on a sale of the land the water right passes as an appurtenance."); *cf. Gasser v. Garden Water Co.*, 81 Idaho 421, 425, 346 P.2d 592, 593 (1959) (stating that the relationship between a mutual irrigation company and a shareholder is contractual).

However, such contracts are to be closely scrutinized because "[t]here are several phrases used in the Idaho Constitution and the Idaho Code that signify that the beneficial users have an interest that is stronger than mere contractual expectancy." *United States v. Pioneer Irr. Dist.*, 144 Idaho 106, 114, 157 P.3d 600, 608 (2007); *see, e.g.*, Idaho Const. Art. 15, §§ 1, 4, 5, and 6. Therefore, while "such a corporation has the usual rights pertaining to corporations with reference to the handling of its affairs and in dealing with its stockholders," the shareholder has the "peculiar" right to the continued distribution of her proportionate share of the waters belonging to or distributed by the mutual irrigation company. *In re. Johnston*, 69 Idaho 139, 144, 204 P.2d 434, 437 (1949). However, "mutual corporations may . . . adopt such rules and regulations not in violation of law governing the distribution and use of the water furnished among their shareholders as are equitable and reasonable under the circumstances of the case." *Gasser*, 81 Idaho at 425, 346 P.2d at 593.

The physical shares are part of this contractual inquiry. A mutual irrigation company's shares can either be attached to specific tracts or they can "float" among all the tracts within the mutual irrigation company's system:

Shares of stock in a mutual company may or may not be attached to specific tracts of land. Attachment to land may result either by way of "location" on specific tracts—resulting from contract between company and shareholders evidenced by articles of incorporation, bylaws and stock certificates—or by representing the rights to receive water considered appurtenant to such tracts. If not attached to specific tracts, they are known as "floating" shares. These floating shares may pass freely from one holder to another and may be used for irrigation of any tract that can be served from the irrigation system as normally operated.

WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES Vol. I, at 479 (1971).

In determining whether the shares are appurtenant to the land, how the company acquired the water right (or rights) can shape the inquiry:

[T]he water rights may be appurtenant to the general service area of the company by reason of its appropriating water for the area as a whole, and the company may not take action in "locating" its shares on specific parcels. In such case, within the limits of transferability set by operational needs, any farmer may transfer his floating stock and the right to water service to any other part of the service area. The only attachment to land that is involved is a temporary one, necessarily recorded on the water delivery schedules of the company superintendent for operational purposes only. And the only appurtenance of water right is to the general service area.

*Id.*

Here, Eagle Creek's water right is appurtenant to the whole of its service area rather than to individual tracts of land because Eagle Creek's governing documents do not "locate" the shares. Idaho Code section 42-219(7) requires reading the SRBA Water Right as appurtenant to "any and all" the 143 acres within Eagle Creek's boundaries. *A & B Irrigation,* 153 Idaho at 514, 284 P.3d at 239. The Articles, Bylaws, and physical shares do not alter this "general" appurtenancy. The closest the Articles and Bylaws get to "locating" the shares, as AC&CE Investments points out, is the statement: "The corporation will hold all water rights acquired in Trust, and operate the system for the distribution of water primarily for the benefit of the lands to which said water rights are to be appurtenant." However, this passage refers to how the company will treat water rights it acquires, not how it will treat shares it issues. In other words, Eagle Creek holds acquired water rights in trust for the lands the water right was appurtenant to before the company acquired it. Thus, shares are not attached to specific tracts of land.

Rather, Eagle Creek uses "floating" shares. The shares state the right to a specific amount of water without listing specific tracts of land. As noted by Eagle Creek, the shares could have

been "located" by containing more specific language. *See Brown v. Portneuf-Marsh Valley Irr. Co.*, 299 F. 338 (D. Idaho 1924). Granted, Eagle Creek's internal recordkeeping books have the shares listed with corresponding lot numbers (e.g. "No. 50 (Lot 17)"). Even so, this appears to be the only indication in Eagle Creek's books and records of appurtenancy to specific tracts of land, and this falls under the sort of "temporary" attachment to land which is "necessarily recorded on the water delivery schedules of the company superintendent for operational purposes only." WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES, Vol. I, at 479 (1971).

Also, because it acquired its water right in a one-off transaction, Eagle Creek's water right began as an appurtenance to the whole of its service area rather than individual tracts of land. The Original Water Right was as a single water right with a large geographic footprint. The SRBA Water Right's permissible place of use does not alter the Original Water right in this regard. It remains a single water right with a large footprint. Had Eagle Creek's SRBA Water Right been compiled by a patchwork of individually held water rights, each with its own appurtenant land, there would be a strong inference that those rights retained their specific appurtenancy. However, here, the Original Water Right began with a large geographic footprint which follows the SRBA Water Right's general appurtenancy.

For this reason, AC&CE Investment's contention that Idaho Code section 42-220 proves that it owns the Enright's shares is without merit. Section 42-220 provides that water rights decreed by a court "shall become appurtenant to, and shall pass with a conveyance of, the land for which the right of use is granted." Here, the Original Water Right, as originally decreed, was made appurtenant to the area around the Eagle Creek subdivision by the Feldhusens' predecessors. The Feldhusens conveyed the Original Water Right to Eagle Creek. *See Fed. Land Bank of Spokane v. Union Cent. Life Ins. Co.*, 54 Idaho 161, 29 P.2d 1009, 1011 (1934) ("A water right is real property and may be sold and transferred separately from the land upon which it has been used, the same as any other real property.") Thereafter, the Original Water Right was appurtenant to all the property which Eagle Creek served and could serve. As mentioned, had the Enrights' predecessors in interest owned a separate water right appurtenant to the specific tract and conveyed it to Eagle Creek in return for shares, those shares would likely retain that appurtenancy in the absence of a contrary intent in the contract. However, the record shows that Eagle Creek acquired 90% of the Original Water Right (207 of 230 miner's inches), but

15

ultimately held 100% of the Original Water Right when the SRBA Water Right was declared. To the extent the Property may have held the remaining 10% of the Original Water Right, that possibility was foreclosed by the SRBA Water Right. While there are some questions regarding the Jonassons's claim in the SRBA, it appears that the Jonnassons filed that claim because Eagle Creek had not yet filed a claim in the SRBA. Eagle Creek believed that claim to be duplicative of its water right, and the Enrights appeared to agree at the time by quitclaiming the claim to Eagle Creek.

In sum, to determine the appurtenancy of a share in a mutual irrigation company, the court must consider the company's governing documents and how it acquired the water rights. These facts directly affect whether the shares are appurtenant to the shareholder's property.

## C. This Court has never conclusively held that all types of shares in a mutual irrigation company pass as an appurtenance to a specific tract of land.

AC&CE Investments argues that Idaho law treats shares in mutual irrigation companies as an externalization of water rights for purposes of resolving whether the rights pass as an appurtenance. Idaho's approach to this question has depended on the type of company, and shares, at issue. At one end, there are cases which treat the shares as personalty. *Wells v. Price,* 6 Idaho 490, 56 P. 266, 267 (1899); *Watson v. Molden*, 10 Idaho 570, 587, 79 P. 503, 507 (1905). At the other end is *Ireton v. Idaho Irrigation Company*, which intimates that such shares merely represent a water right and pass with their described land. 30 Idaho 310, 164 P. 687, 689 (1917).

The *Wells* decision dealt with a mutual irrigation company. 6 Idaho at 490, 56 P. at 266. The two-paragraph opinion centered on whether a writ of attachment to certain lands included the landowner's shares in a mutual irrigation company as an appurtenance. *Id.* Prior to the eventual judicial sale, landowners in the area had organized a mutual canal company which issued stock to landowners in proportion to the interest each owned in the canal and water right conveyed to the company. *Id.* The *Wells* court reasoned that because Idaho's corporate laws expressly provided steps to attach stocks, the creditors could not receive the shares without following those steps. *Id.* The Court also refuted the notion that the shares represented real property. *Id.* at 267 ("Shares of stock in an irrigation corporation are not appurtenant to the land owned by the owner of such shares, even though such land be irrigated by water from a canal owned by such corporation.").

We held to the same logic in *Watson*. There, a landowner fraudulently conveyed land and shares in an irrigation company. 10 Idaho 570, 587, 79 P. 503, 507 (1905). On appeal, the seller

asserted that there was no contract because the shares represented real property rights, so the agreement did not satisfy the statute of frauds. *Id.* Rejecting this argument, the Court cited to *Wells* and the then-enacted Idaho corporate code. *Id.* The Court held that "[a]ll that defendant attempted to sell, or that plaintiff believed he purchased, was so many shares of stock in a canal company, which passes by assignment and delivery. This being true, the property sold was only personal property." *Id.* The corporate code "settle[d] the question as to the status of the property" by stating that "such shares of stock are personal property." *Id.* (citing Section 2611, Rev. St. 1887).

Next was *Ireton v. Idaho Irrigation Company*. 30 Idaho 310, 313, 164 P. 687, 688 (1917). That case stemmed from a priority dispute between two creditors. *Id.* A bank held an earlier filed mortgage on a debtor's land and asserted a right to not only the proceeds of the land sale, but also to the sale of the debtor's shares in the irrigation company. *Id.* The bank claimed the shares passed as appurtenances despite no mention of shares in its mortgage. *Id.* at 15, 164 P. at 687. A Carey Act operating company held a junior security interest in the debtor's shares. *Id.* The debtor had purchased shares from the Carey Act company after acquiring land under the Desert Lands Act. *Id.* In return, the Carey Act company received a purchase-money security interest in the shares. *Id.*

The Court observed that the contract between the State and the Carey Act company provided that the water right would be appurtenant to the land. *Id.* at 315, 164 P. at 689. That the debtor obtained his land from the Desert Lands Act made no difference because the contract between the debtor and the company was governed by "the same terms as conditions" as the Carey Act. *Id.* Thus, the Carey Act company was "in no better position than it would have been, had the land been embraced within a Carey Act entry." *Id.* at 316, 164 P. at 689. The water rights had become appurtenant to the land prior to the debtor's mortgage with the bank. *Id.* So, under the Idaho Code, the bank had a superior mortgage to any appurtenant water right because it was a bona fide purchaser that had recorded first. *Id.*

In response to the Carey Act company's argument that the shares were personal property, the Court voiced the reasoning on which AC&CE Investments now relies:

> It is contended by appellant that the shares of stock in the operating company are personal property, and that the water right passed by assignment of them, and did not become subject to the mortgage on the land. While shares of stock in an ordinary corporation, organized for profit, are personal property, and while this

court has held shares in an irrigation company to be personal property the fact must not be lost sight of that a water right is, as heretofore shown, real estate, and that in case of a mutual irrigation company, not organized for profit, but for the convenience of its members in the management of the irrigation system and in the distribution to them of water for use upon their lands in proportion to their respective interests, ownership of shares of stock in the corporation is but incidental to ownership of a water right. Such shares are muniments of title to the water right, are inseparable from it, and ownership of them passes with the title which they evidence.

*Id.* AC&CE Investments argues that this language settles the case at hand. Eagle Creek, on the other hand, contends that *Ireton* is limited to Carey Act companies.

The *Ireton* court used broad language, but its logic rested on the assumption that the share was appurtenant to the land. A share in a mutual irrigation company is a mere "muniment of title" to which is inseparable from the water right because shareholders are the beneficial owners of the right. Nevertheless, this does not solve whether the share is appurtenant to the land. By *Ireton*'s terms, ownership will not automatically pass unless the shares are tied to the title. Here, the shares cannot pass automatically with the "title which they evidence" because the shares do not refer to the land.

For appurtenancy, *Ireton*'s holding is tied to the Carey Act. *See id.* at 310, 164 P. at 687. As noted, Idaho statutes which implement the Carey Act (and the Carey Act-based contract at issue in *Ireton*) declare that the water rights attach to the land as soon as the federal government issues the patent. Thus, shares in a Carey Act company "evidence title" to particular land because the water right is statutorily granted to the individual settlors (and their specific parcels of land), and thus reflect individual water rights. However, this logic does not mesh with the concept of floating shares because floating shares do not "evidence any title" to specific land. Investigating deeper into *Ireton*'s holding reveals that the two cases cited for this language both contained clear indication that the shares were appurtenant to the specific land. In one case, the shares passed as an appurtenance because the shares were assigned to specific land by description on the back of the certificate. *See Berg v. Yakima Valley Canal Co.*, 83 Wash. 451, 457, 145 P. 619, 621 (1915). Next, *Ireton* quotes the "muniments of title" language from a case where individual irrigators each conveyed a water right to the mutual irrigation company's trust. *Thomas v. Bryant*, 147 Cal. 236, 239, 81 P. 539, 540 (1905). As noted, even though nothing in the corporate documents provided for appurtenancy, the water rights were still appurtenant to the

specific lands they originally applied to in the absence of a severance or intent to provide for general appurtenancy. *Id.*

Thus, *Ireton* does not resolve the issue of shares passing as an appurtenance for all mutual irrigation companies. Rather, as stated above, appurtenancy of a share in a mutual irrigation company is a factual question to be resolved in each case. This is not a sea change in the realm of water law. Appurtenant water rights still pass as appurtenances to land unless specifically reserved in the conveyance. *Joyce Livestock Co. v. United States*, 144 Idaho 1, 14, 156 P.3d 502, 515 (2007). However, in order for the shares to "pass[] with the title which they evidence," it must first be determined whether the shares are appurtenant to the tract of land being conveyed. *Ireton*, 30 Idaho at 317, 164 Idaho at 689. A factual inquiry into the governing documents of the mutual irrigation company and history of the water rights is required.

**D.  The *Bagley* Cases do not conclusively answer the appurtenancy question:**

AC&CE Investments asserts that the *Bagley* cases undisputedly resolve this issue. We disagree. First, it is unclear whether the irrigation company involved in the *Bagley* cases was a mutual irrigation company or a Carey Act operating company. For that reason, whether the shares were appurtenant to the specific land was not evaluated. Likewise, none of the cases reached the merits of whether shares in a mutual irrigation company pass as an appurtenance. Thus, the *Bagley* cases do not conclusively establish that shares in mutual irrigation companies pass as an appurtenance to the land regardless of the governing document or history of the water right.

The *Bagley* cases, three in total, began when the Thomasons conveyed real property "and legal rights to the land as deeded" to the Bagleys in exchange for a promise to reconvey for property some months later for the purchase price plus interest. *Bagley v. Thomason*, 149 Idaho 799, 801, 241 P.3d 972, 974 (2010) ("*Bagley I*"). Things did not go as planned, and a district court was required to quiet title to the real property "together with any and all water rights and fixtures appurtenant thereto" in favor of the Bagleys. On appeal, this Court held that "[t]he failure of the warranty deed to mention water rights or appurtenances did not prevent water rights appurtenant to the land from being conveyed with the real property." *Id.* at 803, 241 P.3d at 976. In *Bagley I*, the Court only mentioned shares in an irrigation company when it recited the Thompsons' counterclaims. *Id.* ("They alleged in count two of their complaint that they suffered

19

damages when Bagleys asserted sole ownership of the real property and ownership of chattels and water shares."). The irrigation company was not a named party in *Bagley I*. *Id.*

After this Court declared that the Bagleys held the water rights appurtenant to the land, the Bagleys requested that the Liberty Park Irrigation Company issue them shares for water appurtenant to the land. *Bagley v. Thomason*, 149 Idaho 806, 807, 241 P.3d 979, 980 (2010) ("*Bagley II*"). The Thomasons refused to give the consent required under Liberty Park's policy for the transfer of 52 shares and threatened to sue Liberty Park if it issued the shares. *Id.* The Bagleys then filed an action against Liberty Park seeking a judgment requiring them to issue the shares. *Id.* After the Bagley's filed a motion for summary judgment, the Thomasons filed a document alleging the Bagleys lacked standing and the Court lacked jurisdiction. *Id.* The Thomasons also told the district court they would not attend the hearing. *Id.* The district court granted the Bagley's motion and awarded attorney's fees, finding that the Thomasons defended the lawsuit frivolously, unreasonably, and without foundation. *Id.*

This Court determined that the Bagleys had standing because they "are the grantees of the deed to the real property executed by Thomasons, and the Bagleys were held in *Bagley I* to be the owners of the real property, including the appurtenant water rights." *Id.* at 807, 241 P.3d at 980. The Court determined that the Bagleys had met the injury, causation, and likelihood-of-judicial-relief requirements of standing because:

> Bagleys alleged that they are entitled to the shares of water appurtenant to the real property; that the Thomasons have refused to deliver the certificates for the shares to the Bagleys and are attempting to sell them; and that the Irrigation District, whose secretary is Byron Thomason's brother, has refused to issue new water shares to Bagleys. They sought a declaratory judgment stating that they owned 52 shares of water in the Irrigation Company and a writ of mandate requiring the Company to issue them certificates of ownership for those shares.

*Id.* We noted that the focus of standing is "not on the merits of the issues raised, but upon the party who is seeking the relief." *Id.* at 808, 241 P.3d at 981 (quoting *Scona, Inc. v. Green Willow Trust*, 133 Idaho 283, 288, 985 P.2d 1145, 1150 (1999)). The Bagleys had standing, and the district court had jurisdiction because "a party can have standing to bring an action, but then lose on the merits." *Id.* We also affirmed the award of attorney's fees. *Id.*

After *Bagley II* was decided, the district court awarded attorney's fees and issued a writ of execution to satisfy the judgment. *Bagley v. Thomason*, 155 Idaho 193, 198–99, 307 P.3d 1219, 1224–25 (2013) ("*Bagley III*"). Appealing *pro se*, the Thomasons argued that the Bagleys

20

did not have standing, that the district court did not have jurisdiction, and that the district court violated their equal-protection rights. *Bagley III*, 155 Idaho at 196, 307 P.3d at 1222. We rejected all these arguments and determined that the Bagleys were entitled to attorney's fees because "the entire appeal [was] pursued frivolously, unreasonably, and without foundation." *Bagley v. Thomason*, 155 Idaho 193, 198–99, 307 P.3d 1219, 1224–25 (2013) (citing *Carrillo v. Boise Tire Co., Inc.,* 152 Idaho 741, 756, 274 P.3d 1256, 1271 (2012)).

AC&CE Investment's contention that these cases "conclusively establish[]" that the Eagle Creek shares automatically passed as an appurtenance with the property is unavailing. *Bagley II* is the only case that explicitly mentions the issue of whether shares in an irrigation organization pass as an appurtenance. *Bagley II* did not reach the merits of that issue because the Thomasons only argued standing. *Bagley III*, 155 Idaho at 196, 307 P.3d at 1222 (citing *Bagley II*, 149 Idaho at 807, 241 P.3d at 980). None of the cases addressed whether shares in a mutual irrigation company pass as an appurtenance to the land because it was taken as a given that the shares were appurtenant to the land. Here, that issue is contested. As explained above, shares in a mutual irrigation *can* be appurtenant to a specific tract of land, but appurtenancy is not an integral feature.

### E.  AC&CE Investments is not entitled to attorney's fees on appeal.

AC&CE Investments asks this Court to award costs and attorney's fees under Idaho Appellate Rules 40 and 41. AC&CE Investments argues it is entitled to attorney's fees under Idaho Code section 12-121 because the "law is well-settled" on this issue. Thus, AC&CE Investments contends, Eagle Creek pursued this appeal "frivolously, unreasonably, or without foundation."

AC&CE Investments is not the prevailing party on appeal. Moreover, as should be evident from the analysis in this opinion, this area of the law is less than "well-settled." We decline to award attorney's fees on appeal.

### V.   CONCLUSION

For the reasons stated above, all issues not decided in the district court's memorandum decision on summary judgement are either dismissed with prejudice or mooted by the parties' settlement agreement. The district court erred in granting summary judgment to AC&CE Investments because the district court did not look to Eagle Creek's governing documents. We vacate the portion of the district court's final judgment which states that the 15 shares of the

21

Eagle Creek stock were appurtenant to the Property. Our decision does not affect the parties' settlement agreement. Costs to Eagle Creek.

Justices BEVAN, STEGNER, MOELLER, and Justice pro tem MELANSON **CONCUR.**